428 P.2d 480

George H. DAWSON, Claimant-Respondent,

v.

Don HARTWICK dba Log Tavern, and Guaranty National Insurance Company, Defendants-Appellants.

George H. DAWSON, Claimant-Respondent,

v.

Anthony E. BRITT dba Royal Lounge and Transamerica Insurance Company, Defendants-Appellants.

Nos. 9856, 9857.

Supreme Court of Idaho.

May 29, 1967.

562

Coughlan & Imhoff, Boise, for appellants Don Hartwick dba Log Tavern and Guaranty National Ins. Co.

Moffatt, Thomas, Barrett & ·Blanton, Boise, for appellants Anthony E. Britt dba Royal Lounge and Transamerica Ins. Co.

Rayborn, Rayborn & Rayborn, Twin Falls, for respondent.

SPEAR, Justice.

The cases of George H. Dawson v. Don Hartwick dba Log Tavern, and Guaranty National Insurance Company; and George H. Dawson v. Anthony E. Britt dba the Royal Lounge, and Transamerica Insurance Company, have been consolidated for appeal. The matter comes before the court for a determination of the liability of employers-appellants the Log Tavern and the Royal Lounge, and their respective compensation sureties, for payment of an award apportioned by the Industrial Accident Board against them in favor of claimant-respondent George H. Dawson. The case involves low back injuries sustained by re-

spondent in successive employments with the appellants-employers which, the Board found, resulted from compensable accidents within the scope of respondent's employment, entitling respondent to workmen's compensation benefits for the injuries received.

Both sets of appellants contest the allowance of the award; and the principal issues raised by the assignments of error of the respective appellants may be summarized in the manner of the following questions:

(1) Did respondent suffer on September 9, 1963 an injury resulting from a compensable accident, as that term is understood in the Workmen's Compensation Law, while in the employ of appellant Log Tavern?

(2) Was the resultant disability of respondent in part caused by an already existing back impairment, making appellant Log Tavern or its compensation surety liable for only such additional disability as was caused by the injury of September 9th?

(3) On March 30, 1965, did respondent, while in the employ of appellant Royal Lounge, sustain injuries resulting from a compensable accident, thus entitling him to workmen's compensation benefits?

(4) Was the Board correct in its apportionment of part of the resulting disability occasioned by the injury of March 30th between appellants Log Tavern and Royal Lounge?

Respondent, a resident of Kimberly, Idaho, first injured his back in either 1948 or 1949 in an automobile accident. The resultant injury caused him to miss work for some time, but a record of the medical diagnosis of the attending physician was not available at the hearing before the Board. However, surgery was not required, and respondent apparently received effective conservative treatment of his back injury. Thus, following recovery, respondent was able to return to his former employment, which entailed strenuous physical labor, without impairment as a result of that injury.

While employed by a moving company in 1954, respondent strained his back moving a piano. This caused respondent to miss about ten days of work. Until the injury sustained on September 9, 1963, respondent experienced no further difficulty with his back. This is evidenced by the fact that in the interim respondent was able to work regularly in several different occupations, some of which involved hard physical labor.

On September 9, 1963, respondent was employed as a bartender at the Log Tavern in Twin Falls, Idaho. That evening, about one hour before the end of his shift, respondent, while stooping down to lift a case of empty bottles with the intention of moving it, felt a sudden and severe pain in his lower back and was hardly able to straighten up. He had to sit down and finally left before his shift was finished, without doing any further work. The next day respondent reported for work and told his employer of the incident the previous evening. He continued working for two to three weeks but had great difficulty in doing so. He suffered persistent pain with attendant numbness localized generally in the right leg and hip.

On account of this difficulty, respondent consulted a physician on October 7, 1963, and on this date he made a formal claim upon his employer for compensation. The doctor prescribed conservative treatment for the apparent back injury; and when that proved unsuccessful, respondent obtained permission to visit Dr. Edward J. Kiefer, a neuro-surgeon of Boise. Dr. Kiefer made a preliminary diagnosis of lumbosacral disc protrusion on the right and hospitalized respondent for myelography and probable laminectomy. The result of the myelogram was positive and supported the preliminary diagnosis and Dr. Kiefer scheduled respondent for surgery.

On October 26, 1963 Dr. Kiefer performed a lumbar laminectomy, and a large disc protrusion at the first sacral nerve root, central in location, but mainly to the right, was discovered. The doctor in routine

fashion removed the disc, which was mushy and grossly degenerated. Respondent was discharged from the hospital on November 4, 1963. The following April 16, 1964, the respondent was pronounced surgically healed with residual partial permanent disability of 10% as compared to the loss of a leg at the hip.

■ Appellant Log Tavern and its compensation surety, Guaranty National Insurance Company, contested the claim which respondent had filed against them growing out of the incident of September 9, 1963. However, on June 22, 1964, the parties were able to reach a compensation agreement, subsequently approved by the Board on June 29th. The compensation agreement was a compromise settlement based upon doubtful liability as is evidenced by the following language from the premise of that agreement:

"Claimant's right to compensation under the Workmen's Compensation Law is a disputed matter, both medically and factually, defendants contending that Claimant's disability and medical treatment are the result of pre-existing conditions and accidents not in anywise related to any employment with the defendant employer herein, and it being recognized by the parties that in the event of litigation the outcome would be uncertain and would entail extensive delay and expense and in view of the above, it is stipulated by the parties that it is to their best interest to settle the cause."

Notwithstanding the foregoing language, which is usually a predicate to a lump sum settlement pursuant to I.C. § 72-321, as amended by Session Laws 1951, ch. 123, the agreement expressly recognizes respondent's retention of his right to modification under I.C. § 72-607, as amended Session Laws 1957, ch. 40. Following the injury of September 9th, respondent's total allowance is summarized as follows:

| | |
|---|---|
| Total temporary compensation: (Oct. 10, 1963 to April 16, 1964—paid on a voluntary basis pursuant to I.C. § 72-319) | $1,420.74 |
| Medical and kindred expenses | 929.91 |
| Specific indemnity for partial permanent disability | 540.00 |
| | $2,890.65 |

The compensation agreement specifically provided that the payments were voluntarily made without admission of liability; consequently, all defenses available to appellant Log Tavern and its compensation surety, Guaranty National, were saved in the event of a subsequent petition for modification.

The specific preservation of defenses incorporated in the compensation agreement in this case distinguishes it from the holdings in such cases as Limprecht v. Bybee, 76 Idaho 293, 281 P.2d 1047; Nitkey v. Bunker Hill & Sullivan Mining & Concentrating Co., 73 Idaho 294, 251 P.2d 216; Blackburn v. Olson, 69 Idaho 428, 207 P.2d 1160; Zapantis v. Central Idaho Min. & Mill Co., 61 Idaho 660, 106 P.2d 113; Rodius v. Coeur D'Alene Mill Co., 46 Idaho 692, 271 P. 1, which have ruled that a compensation agreement approved by the Board has the same effect as an award of the Board; and, therefore, the compensation agreement, where no appeal is taken, becomes final and conclusive and is res adjudicata on all questions which might have been raised as well as to all questions which were raised when the compensation agreement was approved by the Board. Thus, in the case of Blackburn v. Olson, supra, the court held that no appeal having been taken, the compensation agreement was res adjudicata on the

question whether the claimant was or was not engaged in covered employment. See also Evans v. Continental Life and Accident Company, 88 Idaho 254, 398 P.2d 646; Skelly v. Sunshine Mining Co., 62 Idaho 192, 109 P.2d 622; Reagan v. Baxter Foundry Etc. Wks., 53 Idaho 722, 27 P. 2d 62.

Sometime in the summer of 1964, probably in June, respondent, who had been working part time tending bar following recovery from the injury sustained in September, 1963, became steadily employed as a manager at the Royal Lounge in Twin Falls. As manager, respondent was responsible for the premises, made out the payroll, and did the banking in addition to taking his regular shift as bartender. While respondent tired more easily after being on his feet all day than prior to the 1963 disc injury, he did not have any pain and was able to work regularly at his new job.

On March 30, 1965, respondent again injured his back. The plumbing connected with an ice machine at the tavern became clogged, and respondent contacted a plumber to have the condition corrected. To clear the plumbing, the plumber opened a pipe in the basement and caught the clogged sewage in a square galvanized tub, which respondent helped carry up the stairs to the floor above and empty into the alley. Two such trips were made; the first tub, three quarters full, weighed over one hundred pounds. The second tub was about half full. The next morning respondent was hardly able to get out of bed. The pain was severe in his right hip and leg. The classic symptoms of sciatic pain distribution had returned.

The respondent, at the hearing before the Board, testified that when he had returned to clean out the ice machine, within minutes after helping the plumber, he felt a numbness in the right leg and hip. Mr. Weeden, the other bartender, recalled that respondent had put his hand to his back as he bent over the ice machine; however, respondent was unable to remember he had done so. He stated, however, he felt the strain to his back and mentioned the fact whereupon Weeden volunteered to finish cleaning up the ice machine. Moreover, respondent testified, that night, before retiring, he had a more or less throbbing pain in his leg for which it was necessary to take medication. The statement of an insurance adjuster obtained on April 26, 1965 and signed by respondent recites the pain did not start until the following morning, and to this extent contradicts some of the statements to which respondent testified at the hearing.

Following the incident of March 30th, respondent was able to work until April 12th, although, because of pain and discomfort, he found such work difficult. On April 13th, respondent consulted Dr. Kiefer. It was observed by Dr. Kiefer that respondent walked with a limp, with a list of his back to the left, and that there was some straightening of the lumbar spine, instead of the usual normal curvature. On examination, the right ankle reflex was absent, the left normal; straight leg raising on the right was limited, normal on the left. The doctor informed respondent further examination and treatment were indicated and told him to report to the hospital the following day. Immediately respondent called his wife and asked her to inform his employer and the insurance company, which she did. Respondent additionally testified he instructed Dr. Kiefer's secretary to contact Guaranty National, the compensation surety for his former employer.

The next day Dr. Kiefer performed a standard lumbar myelogram. This test revealed no evidence of pathology; however, based on the doctor's prior clinical examination of respondent, a second laminectomy was scheduled. Surgery revealed further extruded disc fragments at the same lumbosacral level as the first injury. Dr. Kiefer testified that this disc tissue was the aftermath of the first surgery. The doctor diagnosed that the tissue was probably lying free in the L5–S1 interspace and extruded into the area between the sacral nerve root and the common dural sac as the

result of the trauma of the second incident of lifting the tubs of sewage on March 30, 1965.

There was, additionally, dense scar tissue over the previously operated site at the lumbosacral level, and the nerve root at this level could not be mobilized since it was bound down with scar tissue. Dr. Kiefer testified the scar tissue which immobilized the nerve root at this level was not the cause of the pain which respondent experienced following the March 30th incident as evidenced by the fact this scarring was there while the patient was asymptomatic. The doctor explained the symptoms which necessitated the second laminectomy resulted from the fact respondent extruded more disc material. Since the nerve root was bound down by scar tissue and therefore had no mobility, Dr. Kiefer further explained, even a small disc extrusion could produce considerable pain because the nerve now had no means of "rolling away" from any compressing lesion. Dr. Kiefer admitted the fact that respondent had a previous injury in the area would make him somewhat more prone to the second injury; however, while respondent did not have a normal back, it was not too abnormal, the doctor pointed out, since the patient was completely asymptomatic prior to the 1964 injury.

Respondent was discharged from the hospital on April 27, 1965. Following this second laminectomy, he was pain-free for about a month; however, on extending and increasing his activities, he began to develop increasing low back and right leg pain. Finally, on July 7, 1965, respondent, unable to make an appointment with Dr. Kiefer, who was then preparing for an extended European vacation, visited Dr. M. B. Shaw. Because of the symptoms which respondent related, Dr. Shaw instructed respondent in postural exercises, the use of a corset as much as possible, and told him to avoid bending, stooping or heavy lifting. The prescribed conservative treatment was ineffective, and Dr. Shaw on July 15th reported that re-exploration of the lumbosacral root emerging at the lumbosacral

canal space on the right was probably indicated. On August 16, 1965, Dr. William R. Tregoning, an associate of Dr. Shaw, took over respondent's case.

Dr. Tregoning, on August 17th, performed a myelogram on respondent. The test was normal; however, the doctor advised a third laminectomy, which was performed the following day. The interspace at L–4–5, which is the level above the original lesion, was explored. While the doctor found no herniated intervertebral disc or other lesion, he did find marked scarring at the LS–S1 interspace, or the area of the first and second surgeries. This was such dense scar tissue, described as almost cartilagineous in consistency, that it proved difficult to cut out with a scapel. The scarring was the result of the two prior surgeries on this area, and was removed along with bone in order to completely mobilize the entire nerve root which Dr. Kiefer had discovered was completely bound down when he operated on respondent the second time. After reading Dr. Tregoning's operative report, Dr. Kiefer concluded that the scar tissue, being probably much more dense following the second operation, had become symptomatic and caused the sciatic pain distribution of which respondent now complained. Put differently, Dr. Kiefer concluded that the cumulative effect of the scarring resulting from the two prior laminectomies caused the present disability of respondent and necessitated the third laminectomy.

Dr. Tregoning last examined respondent on October 26, 1965, after his release from the hospital. He did not consider the respondent surgically healed, and stated he wouldn't think of making a final rating of disability in this case for probably a year.

Respondent, on May 17, 1965, filed with the Board a formal combined notice and claim for compensation benefits dated May 3, 1965 based solely on the alleged accident of March 30, 1965. The following June 24th, respondent, through counsel, filed a petition for hearing, naming as defendants the Royal Lounge and its compensation

surety, Transamerica Insurance Company. However, thereafter, on July 15, 1965, respondent, through counsel, filed with the Board a formal combined notice and claim directed to Log Tavern and its compensation surety, Guaranty National, with respect to the alleged accident of September 9, 1963, and also the alleged accident of March 30, 1965. This was intended as a claim for modification because of a change in condition as is shown by the fact that respondent simultaneously filed an amended petition for hearing, now naming as defendants Log Tavern and Guaranty National as well as Royal Lounge and Transamerica.

There is some evidence that Log Tavern and/or Guaranty National may have had notice of respondent's second accident prior to July 15, 1965, but there was no substantial proof of a claim upon them. The filing of the amended notice and petition on July 15, 1965 is the only substantial proof in the record of a claim upon Hartwick and his surety, based upon the change of condition allegedly primarily due to the incident of March 30, 1965.

The Board, following the hearing, found that both incidents, i. e., that of September 9, 1963 and March 30, 1965, were compensable accidents within the purview of the Workmen's Compensation Law. The Board, in making its factual determinations and in apportioning the award to respondent, segregated three time periods, each including a major surgical operation:

(1) From September 9, 1963, the date of the first accident, to March 30, 1965, the date of the second accident. During this period, on October 26, 1963, a lumbar laminectomy was performed on respondent by Dr. Edward J. Kiefer.

(2) From March 30, 1965 to July 15, 1965, when by amended petition Log Tavern and Guaranty National were first brought into the case as defendants. During this period, Dr. Kiefer, on April 20, 1965, performed a second laminectomy on respondent's lumbar spine.

(3) From July 15, 1965 to and including November 10, the date on which the hearing was continued at Boise. During this period, respondent again submitted to lumbar laminectomy on August 18, performed by Dr. William R. Tregoning.

First, the Board found that appellants Log Tavern and Guaranty National failed to support by substantial evidence that as of the date of respondent's injury of September 9, 1963 there should be a deduction from their liability on account of respondent's pre-existing history of back injury and impairment. Wherefore the Board approved the voluntary payments made pursuant to the compensation agreement under date of June 22, 1963, allowing therefor, however, a credit in the amount of $51.03, representing an overpayment to respondent which resulted because of inaccurate computation of total temporary compensation paid the respondent.

The Board next found that respondent's second accident was the occasion which necessitated the second operation, and on that finding held Royal Lounge and Transamerica *solely* liable for total temporary disability and for medical and kindred expenses for the period March 30, 1965 to July 15, 1965. For this period, respondent was awarded $1,041.35 medical and kindred expenses and $690.86 total temporary disability compensation.

The Board's decision relieving the Log Tavern and Guaranty National from liability during the period March 30 to July 15, 1965 was not predicated upon the technical defense of failure to give proper and timely notice, although the Board concluded that defense was in part valid. The decision rather was based on the conclusion of the Board that the protrusion upon which Dr. Kiefer operated in April, 1965, though in loose language termed a recurrence, was more accurately characterized as another protrusion in the same area occasioned by the second accident. Expenses up to and including July 15, 1965 were those incidental to respondent's second laminectomy.

Lastly, the Board determined that respondent's second accidental injury was prolonged because of the first accidental injury.

Specifically, the Board concluded respondent's third laminectomy was necessitated by the residual effects of both of respondent's accidental injuries and subsequent treatment. Consequently, the Board held both sets of appellants equally liable for total temporary disability and associated medical and kindred expenses during the period July 15, 1965 to November 10, 1965. The respondent thereunder was awarded total medical and kindred expenses in the amount of $822.48 divided equally between the appellants. Appellants Log Tavern and Guaranty National were assessed $433.50 for temporary total disability; appellants Royal Lounge and Transamerica were assessed $442.00.

The Board reserved jurisdiction to determine issues which may arise between the parties subsequent to November 10, 1965, i. e., specifically, indemnification for permanent disability which had not been rated at the time of the hearing.

■ Appellants respectively have contended that the aforementioned incidents of September 9, 1963 and March 30, 1965 were not "accidents" within the purview of the Workmen's Compensation Law. The basis for this contention is the claim that the instant case is devoid of any distinctive unexpected happening which may be categorized as an accident, and that the mere stooping down and lifting the box of empty bottles or the tubs of sewage was a simple act not in anywise peculiar to the regular employment of the respondent. The position advanced by appellants, however, is not supported by Idaho case authority; and, we find the Board correctly concluded, under the evidence, that the two incidents of September 9th and March 30th were accidents, as that term is understood in the Workmen's Compensation Law, which were compensable because they proximately caused the injuries suffered by respondent.

Section 72–201, Idaho Code, provides for the right to compensation where a workman receives personal injuries *caused* by an *accident* arising out of and in the course of employment covered by Workmen's Compensation. The term "accident" is defined in the provision itself in the following manner:

"'Accident,' as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening suddenly and connected with the industry in which it occurs, and which can be definitely located as to time when and place where it occurred, causing an injury, as defined in this law."

This court has recognized the inherent difficulty which must accompany a determination of whether an incident or happenstance is legally designable an accident within the purview of the Workmen's Compensation Law.

"It is not an easy task for the board or the court to always discern the exact dividing line beyond which an incident or happenstance becomes sufficiently definite and localized as to time, place, and circumstance, that it may be legally designated an *accident*. The difficulty of the task, however, instead of relieving us of the duty, renders it the more imperative that we discharge it with a sound discrimination." Hoffman v. Consumers Water Co., 61 Idaho 226, 229, 99 P.2d 919, 920, quoting from Sonson v. Arbogast, 60 Idaho 582, 585, 94 P.2d 672, 673.

In the recent case, Hammond v. Kootenai County, 91 Idaho 208, 419 P.2d 209, at p. 210, that court reaffirmed the principle:

"'To constitute an "accident" it is not necessary that the workman slip or fall or that the machinery fail. An "accident" occurs in doing what the workman habitually does if any unexpected, undesigned, unlooked-for or untoward event or mishap, connected with or growing out of the employment, takes place.'"

See Lewis v. Department of Law Enforcement, 79 Idaho 40, 311 P.2d 976, where this question was given thoughtful consideration and the prior Idaho case law carefully reviewed.

■ The record affords ample, competent evidence the respective incidents of September 9, 1963 and March 30, 1965 were suffi-

ciently definite and localized as to time, place and circumstance to be designated legally as accidents under I.C. § 72–201. In each instance one can point to a specific incident and conclude the injury was the direct result of that event. Harding v. Idaho Department Store, 80 Idaho 156, 326 P.2d 992. (Claimant-employee of department store stooped over to place where package was stored under counter and experienced a sudden sharp pain in the lower back which subsequently necessitated an operation to remove a herniated disc.) Compare, Welch v. Safeway Stores, Inc., 87 Idaho 396, 393 P.2d 594. See generally, Lewis v. Department of Law Enforcement, supra.

■ Additionally, the record establishes that respondent proved a *probable,* and not merely a possible, connection between cause and effect of accident and injury within the rule most recently set forth in Davenport v. Big Tom Breeder Farms, Inc., 85 Idaho 604, 382 P.2d 762. See for example, Golay v. Stoddard, 60 Idaho 168, 89 P.2d 1002, where this court held that in the absence of evidence that cafe employee prior to fall suffered with spinal or other trouble, probability that employee's spinal trouble was caused by the fall was established. With regard to the respective accidents of September 9th and March 30th, the record is clear that respondent on each occasion thereafter suffered physical impairment not present immediately prior to the accidents. The court in the *Golay* case, moreover, reiterated the principle that it is never necessary that a claimant prove the exact manner in which an employee is injured, since to require such a certainty of proof would, in some cases, defeat the very purpose of the Workmen's Compensation Law. The injuries suffered by respondent were compensable because they resulted from industrial accidents. I.C. §§ 72–201, 72–1013.

Secondly, the record also establishes the Board correctly apportioned total temporary disability, medical and kindred expenses to date between the respective employments. Apportionment of compensation for future hospitalization, medical treatment and disability must await future developments, and remain open for future consideration and determination by the Board.

■ The Board is authorized to find causes of disability *if* attributable to more than one factor and to apportion disability between an industrial injury and pre-existing infirmity, or between successive industrial injuries. Such authority has been judicially interpreted to include apportionment of hospital, medical and kindred expenses. I.C. § 72–323, as amended, Session Laws 1963, ch. 277. Clark v. Brennan Construction Company, 84 Idaho 384, 372 P.2d 761; Andrus v. Boise Fruit & Produce Company, 84 Idaho 245, 371 P.2d 256; Lindskog v. Rosebud Mines, Inc., 84 Idaho 160, 369 P.2d 580; Harris v. Bechtel Corporation, 74 Idaho 308, 261 P.2d 818; Wilson v. Gardner Associated, Inc., 91 Idaho 496, 426 P.2d 567 (1967).

·■ Because the Board is presumed by its experience to be able to judge causative factors of disability in a particular case, the rule has been established the Board must be allowed some degree of latitude in making an apportionment. Additionally, in accord with the standard procedure of appellate review, an apportionment will not be overturned when sustained by substantial and competent, although conflicting, evidence. See cases, supra. Similarly, findings of fact made by the Board, when supported by competent evidence, are conclusive on appeal; and the weight and credibility of testimony, including opinions of medical experts hypothetically stated, is within the special province of the Board. Arnold v. Splendid Bakery, 88 Idaho 455, 401 P.2d 271; Bennett v. Bunker Hill Co., 88 Idaho 300, 399 P.2d 270; Duerock v. Acarregui, 87 Idaho 24, 390 P.2d 55; Profitt v. DeAtley-Overman, Inc., 86 Idaho 207, 384 P.2d 473; Comish v. Simplot Fertilizer Company, 86 Idaho 79, 383 P.2d 333; Nitkey v. Bunker Hill & Sullivan Mining & Con. Co., 73 Idaho 294, 251 P.2d 216. .

■ First, the Board did not err in concluding that appellants Log Tavern and

Guaranty National failed to support with substantial evidence their contention, that as of the date of respondent's injury of September 9, 1963, there should be a deduction from their liability on account of respondent's pre-existing back injury. The record does not include a medical diagnosis of the injury which admittedly respondent sustained either in 1948 or 1949. The record evidenced, however, that respondent thereafter was able to, and did, engage in several occupations which involved heavy manual labor without any apparent impairment because of the prior injury. Consequently, prior to the accident of September 9, 1963, respondent exhibited no evidence of disability such as followed the accident, and, at best, it is mere conjecture that the prior injury contributed to that disability. Compare Cook v. Roland T. Romrell Company, 90 Idaho 155, 409 P.2d 104.

 Secondly, the Board's decision making appellants Royal Lounge and Transamerica liable for the disc injury sustained by respondent on March 30, 1965 is supported by the record and, consequently, must be upheld. Dr. Kiefer testified that while respondent did not have a normal back following his first surgery, it was not too abnormal, since respondent was asymptomatic before the injury on March 30th. Comparing respondent's condition on April 16, 1964, with his condition on April 13, 1965, Dr. Kiefer, on the latter date, found signs not present the year before: respondent walked with a limp; had a list in his back to the left and some straightening of the lumbar spine instead of the normal curvature; and the right ankle reflex was absent. Such findings in the doctor's opinion were consonant with a new injury. Speaking of the cause of the second disc injury, Dr. Kiefer stated, "Based on what I know and the history obtained from the patient, I would say that [the tub lifting incident] is the exciting factor which produced the recurrent disc protrusion." Dr. Kiefer's testimony makes evident that the protrusion upon which he operated in April 1965, though in loose language

termed a recurrence, was better characterized as another protrusion in the same area.

 Appellants attempt to impeach the conclusions of Dr. Kiefer on the ground the record evidences the respondent was not asymptomatic following recovery from the first laminectomy from which it may be concluded the continuing disability greatly contributed to the second injury, if not the sole cause. Repeatedly, appellants objected to the whole line of hypothetical questions by which it was assumed the respondent was asymptomatic. Although testimony was presented that respondent tired on his feet more readily after the first surgery, the record, on the other hand, is clear that respondent worked regularly without disability or impairment or pain until the March 30, 1965 accident. There is no substantial basis for concluding that Dr. Kiefer erroneously categorized the respondent as asymptomatic following his first surgery or that answers to hypothetical questions were tarnished because premised upon an inaccurate assumption. Dr. Kiefer was not only an expert witness, but also an attending physician who was thoroughly informed of his patient's condition. The weight and credibility of the medical testimony proffered by Dr. Kiefer, including that in response to questions hypothetically stated, was for the determination and assessment of the Board. See cases, supra. The testimony, additionally, when viewed in its entirety, i. e., both medical and lay testimony, more than amply supports the Board's conclusion respondent in fact sustained a new injury. Walker v. Hogue, 67 Idaho 484, 185 P.2d 708, established the principle that the Board is presumed by reason of its experience to be able to judge causative factors in a particular case on both medical and non-medical evidence. Kernaghan v. Sunshine Min. Co., 73 Idaho 106, 245 P.2d 806; Application of Idaho Hospital Ass'n, 76 Idaho 34, 277 P.2d 287.

 The Board was not required to allocate liability for medical and kindred expenses and compensation for total temporary disability where the immediacy and necessity for the second operation was occasioned

solely by the second accident. Cf. Clark v. Brennan Const. Co., supra; Andrus v. Boise Fruit & Produce Company, supra; Lindskog v. Rosebud Mines, Inc., supra.

Thirdly, because respondent's third surgery was necessitated by the residual effects of the prior two surgeries, which involved the build-up of scar tissue until the tissue itself became symptomatic, the Board was not in error in apportioning liability for medical, hospital and kindred expenses and compensation benefits for total temporary disability between respondent's successive employments for the period July 15, 1965 to date of the hearing. Compare Beard v. Post Co., 82 Idaho 38, 348 P.2d 939.

Under this apportionment award, appellants Log Tavern and Guaranty National cannot claim prejudice because of lack of notice of the second accident until July 15, 1965, and their liability cannot be precluded on this ground. I.C. § 72–405; Long v. Brown, 64 Idaho 39, 128 P.2d 754. See Ansbaugh v. Potlatch Forests, Inc., 80 Idaho 515, 334 P.2d 442.

Award of the Industrial Accident Board affirmed. Costs to respondent.

TAYLOR, C. J., and SMITH, McQUADE and McFADDEN, JJ., concur.